STATE OF MAINE                    UNIFIED CRIMINAL DOCKET

Cumberland, ss.

HOLLY MORRISON

             Petitioner

v.                                   Docket No. CUMCD-CR-16-02390

STATE OF MAINE

             Respondent

## DECISION AND JUDGMENT

This post-conviction case arises out of Petitioner Holly Ann Morrison's conviction in the underlying criminal case captioned as *State v. Morrison*, CUMCD-CR-14-1530. The post-conviction hearing on Petitioner's Amended Petition was held April 3, 2017, with Petitioner and the State appearing and presenting evidence.

Three witnesses testified at the post-conviction hearing: Gregory Ford, a licensed clinical professional counselor; Amanda Doherty, Esq., Petitioner's counsel in the underlying criminal case as well as in a related child protective proceeding, and Petitioner herself. The hearing was recorded. During the hearing, the Petitioner was granted leave to add a further ground for relief to the 11 grounds for relief contained in her Amended Petition.

Pursuant to the previously issued Rule 72A Conference Order in this case, all filings (including filings by the parties or the court and any transcripts) in the underlying criminal case as well as filings in this case became part of the post-conviction review record without being offered as exhibits.

1

Based on the entire record, the court adopts the following findings of fact and conclusions of law, and denies the Amended Petition, as further amended.

*Factual Background*

The following background facts are derived from testimony at Petitioner's criminal trial as well as testimony at the post-conviction hearing.

Petitioner Holly Morrison is 37 years of age. She has some cognitive deficits and has been tested as having an IQ of 75.

She grew up in the Bangor area and had a very difficult upbringing: her mother was murdered by a boyfriend; Petitioner was sexually assaulted at age 5, and Petitioner wound up being placed in 12 different foster homes by the age of 18. She has three children, of whom the oldest is the named victim in the underlying criminal case. When the victim was about nine months old, Petitioner began what proved to be an abusive relationship with the man who is the father of Petitioner's two younger children. In the course of that relationship, Petitioner and her partner engaged in "swinging," i.e., attending social events that included sexual encounters.

In 2008, at one of the swinger events, Petitioner met Donald Cass, her co-defendant in the underlying criminal case. In 2010, Mr. Cass brought Petitioner and her daughter, the victim, to southern Maine, where Petitioner's father lived. Petitioner and the victim lived in a shelter for about a year and then moved into an apartment. Mr. Cass would visit on weekends and assisted Petitioner financially at times. In 2011, Petitioner and the victim moved to an apartment in Westbrook and Petitioner's relationship with Donald Cass continued.

Petitioner had worked as a personal care attendant periodically and continued in that employment when she moved to southern Maine. As of October 2013, she had

2

been certified for 12 years as a personal care attendant and was employed in that capacity. She also was taking medical assistant courses at night.

In 2013, Petitioner noticed that Mr. Cass was engaged in inappropriate behavior toward the victim and making inappropriate comments about the victim, and she discouraged him from doing so. However, late in that year, Petitioner witnessed and, to an extent, participated in sexual acts that Mr. Cass perpetrated upon the victim, acts that led to the criminal charges against Mr. Cass and Petitioner.

The victim's 14th birthday occurred on October 26, 2013. Almost three weeks later, on November 14, 2013, the victim reported to a counselor at the Westbrook Middle School, where the victim was a student, that she had been sexually abused by her mother's boyfriend. The counselor left a telephone message for the Petitioner about what her daughter had reported and also notified the Maine Department of Health and Human Services (DHHS) and the Westbrook Police Department.

The police came to the school the same day and conducted an interview with the victim. In her initial report and in the police interview, the victim reported that Mr. Cass had used one or more sexual devices in the course of the sexual acts he committed against her. The victim also implicated her mother, the Petitioner, as being aware of Mr. Cass's actions and even participating in some respects.

Later the same day, after hearing the telephone message, Petitioner came to the school and was interviewed by the Westbrook police. The interview was recorded. She then went back to her apartment with a police detective and consented to him searching the apartment and a storage unit for the sexual devices that the victim had mentioned in her report and interview. The search of a storage unit revealed two duffel bags that

3

Petitioner identified as belonging to Mr. Cass and these were seized by police, but not searched at the time.

The next day, November 15, 2013, Mr. Cass met with the Westbrook police and consented to a search of the two duffel bags, which proved to contain numerous sexual devices.

On November 18, 2013, Petitioner came to the Westbrook Police Department for a further interview that was recorded on video. Initially, only Detective Crocker of the Westbrook Police Department participated in interviewing Petitioner, but later another detective came into the interview room. As Detective Crocker testified at trial, Petitioner began the interview "saying that the events did not happen and incrementally disclosed certainly that they had happened, that she had not told me prior." Trial Transcript at 79 (testimony of Steven Crocker).

After the interview, the Westbrook police obtained a warrant to search Donald Cass's residence and, as a result of the ensuing search, discovered more devices of a sexual nature.

*The Criminal Charges and Trial*

The complaint in Petitioner's underlying criminal case was docketed March 10, 2014. An arrest warrant was authorized and Petitioner was arrested and brought to court March 17, 2015. The court set bail with a cash component and no-contact conditions and appointed Amanda Doherty, Esq. to represent Petitioner. Attorney Doherty (also referred to herein as "defense counsel") is now an assistant district attorney with the Cumberland County District Attorney's Office but was a criminal defense attorney at the time of her appointment to represent Petitioner. She was

4

already representing Petitioner in a child protective proceeding that the Maine DHHS had commenced against Petitioner on behalf of the victim.

In April 2014, the Cumberland County grand jury issued an indictment charging Petitioner with six criminal offenses alleged to have been committed on dates between October 1, 2013 and October 25, 2013—an interval ending the day before the victim's 14th birthday. Three of the offenses charged were the same: Endangering the Welfare of a Child, Class D, 17-A M.R.S. § 554(1)(C). The three remaining charges were all of Gross Sexual Assault (GSA), Class A, *id.* § 253, but under two different sections of the GSA statute. Two of the GSA charges alleged that the named victim had submitted to a sexual act as a result of compulsion, *id.* § 253(1)(A), whereas the third GSA charge alleged that the sexual act had been committed before the victim's 14th birthday. *Id.* § 253(1)(B).

Petitioner pleaded not guilty to all six charges.

The State also initiated a criminal prosecution against Donald Cass based on similar allegations. At some point before July 2014, when Petitioner's case came to trial, Donald Cass pleaded guilty to two counts of GSA against the victim and was sentenced.

As attorney Doherty's representation of Petitioner in both the DHHS child protective case and the criminal case continued, she developed a theory of defense. Having in mind the Petitioner's limited intellectual capacity as well as the Petitioner's history of abuse, beginning in childhood, and also having in mind that the charges would likely be supported by the victim's testimony and potentially the testimony of Donald Carr, as well as the Petitioner's admissions during the second interview,

5

attorney Doherty decided that the best course of action for Petitioner's defense was not to challenge the veracity of the victim's report of being sexually abused.

Instead, the defense strategy came to center upon what at the post-conviction hearing was referred to as "the battered woman defense," i.e. to portray Petitioner's involvement in Mr. Cass's sexual abuse of the victim as being the result of both being dominated by and afraid of Mr. Cass and also having been traumatized by a long history of being abused herself physically, emotionally and sexually. Petitioner readily embraced this strategy.

The strategy had several implications for the criminal case. First, it meant that defense counsel's focus was less on challenging the victim's account of what had occurred than on distancing the Petitioner from Mr. Cass. Second, it meant developing an evidentiary basis, likely in expert evidence, for a defense based on Petitioner's psychological state and history of having been abused.

In early 2014, attorney Doherty arranged for Petitioner to meet with Gregory Ford, a licensed clinical professional counselor with extensive experience counseling people involved in sexual abuse either as victims or as perpetrators or both. Attorney Doherty had in mind for Mr. Ford to counsel Petitioner, but also to familiarize himself with Petitioner and her background sufficiently to enable him to testify as an expert witness in her defense, focusing on her status as a victim of abuse.

Mr. Ford began meeting with Petitioner after she was released from jail in March 2014 and continued meeting with her at least once a week, evidently until her sentencing in May 2015. A major theme of Mr. Ford's counseling—and also of the extensive discussions that Petitioner had with her defense counsel—was for Petitioner to acknowledge and understand her own role and responsibility in the victimization of

6

her daughter. Petitioner's focus at that time tended to be on herself more than on her daughter and she struggled to acknowledge her contribution to her daughter's abuse. Over time, the Petitioner came to see that she had failed to protect the victim, and that realization helped bring about her decision to accept responsibility for the endangering welfare charges that she faced. Petitioner benefited from Mr. Ford's counseling.

At some point, Mr. Ford prepared a written report, which defense counsel provided to the State in anticipation of Mr. Ford's expert testimony.

The case went to a dispositional conference June 5, 2014 and was not resolved. The State was seeking a harsher sentence for Petitioner than Mr. Cass had received.

Petitioner then submitted a letter to the court dated June 10, 2014 asking that attorney Doherty be replaced with a different court-appointed attorney. Petitioner's letter stated that her attorney "is not looking out for my best interest," citing two reasons: that Petitioner had requested "documentation and other forms of evidence from my attorney and I have received very minimal information" and "I have requested that an evaluation be completed on myself and my attorney has disagreed with this request and will not proceed." The Petitioner's request for different counsel was denied June 16, 2014.

At that point, Petitioner decided to enter an open plea to the charges against her, thinking she might receive a more lenient sentence than the State was prepared to offer her. Her case was scheduled for a Rule 11 plea on June 24, 2016. However, she changed her mind and did not enter any change of plea.

The case was then scheduled for jury trial in July 2014, before Judge Moskowitz.

Before trial, Petitioner and attorney Doherty discussed and decided on the choices that Petitioner would face in the course of the trial.

First, Petitioner accepted her defense counsel's proposed defense strategy of not challenging the victim's allegations and instead portraying Petitioner herself as a victim of abuse who was influenced and even intimidated by Mr. Cass. That strategy would explain Petitioner's passivity during the times Mr. Cass committed sexual abuse, and would also explain why she was not forthcoming during the initial police interview and only gradually revealed the truth. It would also enable Petitioner to align herself with the victim and against Mr. Cass.

Second, Petitioner agreed, however reluctantly, that she would accept responsibility for the three Class D charges of endangering the welfare of a child. Given that Petitioner's defense strategy meant not challenging the victim's allegations of abuse by Mr. Cass in the presence of Petitioner, it would be untenable for the Petitioner to contest the State's contention that she had endangered her daughter's welfare. To contest the endangering charges could also detract from Petitioner's credibility in the eyes of the jury and increase the risk of conviction on the far more serious GSA charges.

Third, it was agreed and understood that, because Gregory Ford was being designated as an expert witness on Petitioner's mental, Petitioner would likely not need to testify. Attorney Doherty had concerns about Petitioner's ability to present consistent and constructive testimony. Despite having told her attorney and Mr. Ford that she was prepared to accept responsibility for the endangering charges, Petitioner still was focused largely on herself and her own needs, and defense counsel had concerns about what the jury would make of Petitioner and her testimony, particularly on cross-examination.

8

Although Mr. Ford's presentation would likely make it unnecessary for the Petitioner herself to testify, attorney Doherty still took steps to prepare Petitioner to testify in her own defense if the need arose. Attorney Doherty developed a list of likely questions and went over it with Petitioner. Even so, the plan remained for Petitioner not to testify, both because Petitioner was reluctant and also because attorney Doherty had concluded, after much discussion with Petitioner, that Petitioner would be an unpredictable witness.

Petitioner's two-day jury trial took place on July 22 and 23, 2014.

In her opening statement, as agreed by Petitioner, defense counsel told the jury that "[w]e are not here to dispute what Ms. Morrison's boyfriend, Donald Cass, did. What we are here to dispute is the degree to which Ms. Morrison was involved." Trial Transcript at 18. As authorized by Petitioner, defense counsel also told the jury that Petitioner "does not dispute her guilt on the endangering the welfare of a child charges." *Id.* at 19.

The State's witnesses were the victim, Donald Cass, the school counselor, and three law enforcement officers. Their testimony is discussed in detail below. Recordings of both of the interviews of Petitioner by the Westbrook police were played in the presence of the jury in the course of the State's case-in-chief.

After the State had rested its case, counsel and the court discussed at length whether Petitioner should be allowed to call Gregory Ford. Trial Transcript at 177-92. It was the court that first raised a question about whether Mr. Ford should be permitted to testify. *See id.* at 177. Defense counsel had provided the State's attorney with a copy of Mr. Ford's report, and the State had not noted any objection to his proposed testimony. However, in the course of the discussion after the State had rested its case-

9

in-chief, the State registered an objection to Mr. Ford being permitted to testify. *See id.* at 188. Eventually, the court barred Petitioner from calling Mr. Ford as a witness on the grounds that his testimony was not relevant and was based substantially on hearsay information from Petitioner herself. *Id.* at 192.

This unexpected development meant that the Petitioner had to decide whether to testify. The court gave defense counsel the opportunity to go over the decision with her client. *See* Trial Transcript at 198 (recess for 26 minutes); *id.* at 202 (12-minute recess). Having Petitioner testify was not defense counsel's preference, because she viewed Petitioner as an unpredictable witness, but with Mr. Ford's testimony excluded, the only means of presenting the defense theory that Petitioner was involved in the abuse only because she was influenced and pressured by Mr. Cass was through Petitioner's own testimony.

Petitioner testified in detail about her difficult childhood and history of being abused by relatives and by the man with whom she had two of her three children. Trial Transcript at 208-16. She then testified as to her relationship with Mr. Cass—how he intimidated her, how he convinced her that his sexualized behavior toward the victim was "normal," and how she failed to call the police about Mr. Cass's actions because she was afraid of him. *Id.* at 216-30.

Toward the end of Petitioner's direct testimony, defense counsel elicited from Petitioner that she agreed with the victim's recitation of what happened and also that the victim turned 14 years old just three weeks before she disclosed the abuse to her school counselor. Trial Transcript at 242.

On cross-examination, Petitioner was pressed on why she had initially denied any abuse of her daughter when interviewed by police, and had concede that Mr. Cass

10

had never actually been violent toward her. *See* Trial Transcript at 244-64. She repeatedly maintained that she was afraid of Mr. Cass, based on her past history of being abused by her domestic partners. *Id.* at 262-63.

On redirect, Petitioner reiterated that she had gone along with Mr. Cass's abuse of the victim only because she was afraid of him, based on "my past history of abuse." Trial Transcript at 265-266.

After re-cross and re-re-direct, Petitioner's testimony was completed. *See* Trial Transcript at 278-82.

At sidebar, defense counsel renewed her request to call Gregory Ford as an expert witness, adding to her previous argument the ground that Petitioner's accomplice liability had been generated by the evidence and that Mr. Ford's testimony would be relevant to Petitioner's mental state for purposes of the elements of accomplice liability. Trial Transcript at 282-84. The court again denied the request, *id.* at 284, and Petitioner rested her case-in-chief. The State did not present rebuttal evidence.

After the closing arguments and charge, the jury commenced deliberations. The jury sent three notes: the first requesting a list of the charges; the second requesting a definition of "compulsion," and the third requesting that a portion of the victim's testimony be read back. Trial Transcript at 335-39.

The verdict came thereafter. The jury found the Petitioner guilty of Count I, charging gross sexual assault, Class A, of a child under age 14, and of the three Class D counts charging endangering the welfare of a child. The jury acquitted the Petitioner of the two charges of gross sexual assault, Class A, based on compulsion. Trial Transcript at 345-46.

11

Petitioner was granted post-conviction bail pending completion of a pre-sentence investigation. Defense counsel filed a motion for new trial based on the exclusion of Mr. Ford's testimony, but also based on the court's failure to instruct the jury on accomplice liability, and based on what the motion contended was newly discovered evidence that Petitioner's father had abused her in the same manner that Mr. Cass had abused the victim. *See* Defendant's Motion for New Trial (Aug. 1, 2014).

On May 1, 2015, the case again came before Judge Moskowitz, for oral argument and a ruling on Petitioner's motion for new trial and, in the event the motion was denied, for sentencing on the four charges upon which Petitioner was convicted. The court denied the motion for new trial, and the case proceeded to sentencing. Sentencing Transcript at 5-6 (May 1, 2015).

The State recommended a sentence on the Class A GSA charge in Count I of 16 years, all but eight suspended, and four years of probation. Sentencing Transcript at 17. After the State's sentencing presentation, defense counsel presented the Petitioner's position, recommending a sentence on Count I of 10 years, all but 18 months suspended, and probation as decided by the court. *Id.* at 40. Both the Petitioner and Mr. Ford then spoke on Petitioner's behalf, and defense counsel concluded with final words on Petitioner's behalf. *Id.* at 40-49.

On the Class A charge in Count I, Petitioner was sentenced to 15 years in prison, all but three years suspended, and four years of probation. On the three misdemeanor charges, she received 364-day sentences, concurrent with each other and with the sentence on Count I. Sentencing Transcript at 59, 63.

Still represented by attorney Doherty, Petitioner appealed her conviction to the Supreme Judicial Court of Maine, sitting as the Law Court, raising the sole issue of the

trial court's exclusion of Gregory Morrison's proposed testimony. *See State v. Morrison*, 2016 ME 47, 135 A.3d 343. Petitioner also sought leave to appeal her sentence. Her conviction was affirmed and her request for review of her sentence was denied. *See id.* She is presently serving the unsuspended portion of her sentence on Count I, with an anticipated date of release in October 2017.

In April 2016, Petitioner filed her petition for post-conviction review. After post-conviction counsel was appointed, an Amended Petition was filed. It adopted the grounds Petitioner's own petition had advanced, and added several additional grounds. Each of the 11 grounds enumerated in the Amended Petition is addressed in the following analysis.

In addition, Petitioner moved to further amend her Petition orally during the post-conviction hearing to add a twelfth ground—alleged failure of her defense counsel to explore adequately the timing of the alleged incidents of sexual abuse in relation to the victim's 14th birthday. That ground is also addressed below.

*Analysis*

Petitioner's sole basis for seeking post-conviction review is ineffective assistance of counsel. A criminal defendant is constitutionally entitled to effective assistance of counsel in the course of defense. *Middleton v. State*, 2015 ME 164, ¶ 10, 129 A.3d 962. *See* U.S. Const. amend. VI; Me. Const. art. I, § 6.

When a defendant seeks post-conviction review based on a claim of ineffective assistance of counsel, Maine courts apply the two-part test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) for purposes of both the United States Constitution and the Maine Constitution. *See Manley v. State*, 2015

13

ME 117, ¶¶ 12, 18, 123 A.3d 219 (adopting the *Strickland* test for purposes of the Maine Constitution).

The first part of the *Strickland* test requires the post-conviction petitioner to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment, [and to show that] in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland* at 690. This part of the test requires the post-conviction court to "apply[] a heavy measure of deference to counsel's judgments." *Id.* at 691. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Middleton v. State*, 2015 ME at ¶ 13, 129 A.3d 962, *quoting Strickland v. Washington*, 466 U.S. at 689.

The second part of the test requires the post-conviction petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 695.

A post-conviction petitioner must satisfy both parts of the test in order to prevail on the claim for post-conviction relief—if the post-conviction court decides that the petitioner has not met his or her burden as to either of the two parts, the court need not address the other part. *See Strickland* at 697 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the

14

inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one"); *accord, Middleton* at ¶ 12, 129 A.3d 962.

In keeping with this framework, the court addresses each ground of the Amended Petition in light of the entire record in this and the underlying criminal case.

*Ground No. 1: Failure to Challenge the Admissibility of Petitioner's Statements during Interviews by Police*

The first enumerated ground in the Amended Petition challenges defense counsel's failure to seek to suppress Petitioner's statements made during her two interviews by police. Neither interview involved Miranda warnings. No motion to suppress was filed, and the State caused recordings of both interviews to be played for the jury with no objection from the defense. Trial Transcript at 70, 80.

However, Petitioner's argument does not withstand closer examination. First, it is by no means clear that the trial court would have decided that either of the two interviews became custodial at any point and should be excluded. This is especially true of the interview at the school. Second, in light of the defense strategy to endorse the victim's accusations against Mr. Cass, it could reasonably be viewed as helpful for the jury to hear that Petitioner had disclosed Mr. Cass's crimes to the police, albeit belatedly, could reasonably be considered helpful to the Petitioner's cause.

The court concludes that defense counsel's failure to object, by means of a motion to suppress or otherwise, to the admissibility of Petitioner's statements to police was not ineffective assistance, and therefore concludes that Petitioner has not shown ineffective assistance of counsel for purposes of Ground No. 1 of her Amended Petition.

*Ground No. 2: Petitioner Being Called to Testify*

The second ground alleges that attorney Doherty "flip-flopped" on whether Petitioner should testify at trial and ultimately decided to call Petitioner to testify without adequate preparation, noting that, just before Petitioner's testimony, attorney Doherty said to the court, "I'm intrigued, myself, quite frankly" about what Petitioner would say. Trial Transcript at 201.

As noted above, however, attorney Doherty did prepare the Petitioner to testify, even though she did not anticipate Petitioner doing so, by sending Petitioner a list of questions and going over her potential testimony before trial. Despite this preparation, she remained concerned about Petitioner's unpredictability as a witness, and the comment quoted above reflects that concern. Plainly, attorney Doherty was surprised by the exclusion of Gregory Ford's prospective testimony, coming as it did midway through the trial. However, she met during two recesses with Petitioner and secured the Petitioner's agreement to testify. Under the circumstances, the court cannot say that defense counsel's actions and decisions constituted ineffective assistance, and therefore denies relief based on Ground No. 2.

*Ground No. 3: Failure to Call Character Witnesses*

Ground No. 3 in the Amended Petition adopts, without further elaboration or explanation, the third ground in the original Petition. The original Petition appears to assert that defense counsel should have called witnesses to testify as to the Petitioner's and Mr. Cass's character—one witness who "knew Mr. Cass before I did" and other witnesses to say that "I would never do what I am be[ing] charged for." Petition at 4. Testimony that someone would "never do" what they are charged with is not admissible, and there is no indication that any of the witnesses could have offered

16

evidence regarding a relevant character trait of the Petitioner. *See* M.R. Evid. 404(a)(2). Accordingly, Ground No. 3 does not afford a basis for post-conviction relief because there is no indication that the failure to call these witnesses constituted ineffective assistance or caused any prejudice.

*Ground No. 4: Failure to Ask Petitioner if She was Testifying Truthfully*

Ground No. 4 in the Amended Petition adopts, without further elaboration or explanation, the fourth ground in the original Petition. That ground appears to assert that defense counsel failed to question Petitioner during her testimony about whether Petitioner was telling the truth in testifying. Petition at 4. Generally speaking, a witness is not supposed to be asked to comment on his or her own or another witness's credibility. *See State v. Goodwin*, 1997 ME 69, ¶ 5, 691 A.2d 1246, 1247. Ground No. 4 does not afford a basis for post-conviction relief because there is no indication that the alleged omission constituted ineffective assistance of counsel or caused any prejudice.

*Ground No. 5: Concession About Guilt on Endangering Charges*

The Amended Petition asserts as its fifth ground that by conceding in her opening statement that Petitioner was guilty of the three misdemeanor endangering charges, "trial counsel irreparably prejudiced her client's case." As noted above, Petitioner's only truly viable trial strategy, given that both the victim and Mr. Cass were testifying against her, was the one defense counsel had developed, endorsing the victim's account of what happened and distancing the Petitioner from Mr. Cass's actions. It would have been untenable for Petitioner to adopt the victim's account and yet to dispute the State's contention that she had endangered the victim by exposing her to abuse by Mr. Cass.

17

At the post-conviction hearing, Petitioner confirmed that she wished to accept—and to be seen as accepting—responsibility for endangering her daughter, so her contention that defense counsel should not have told the jury that Petitioner did not dispute those charges is not grounds for post-conviction relief.

*Ground No. 6: Failure to Object to Leading Questions*

The sixth ground asserted in the Amended Petition is that defense counsel's failure to object to the State's leading questions in its direct examination of the victim was "irreparably prejudicial to petitioner." The trial transcript indicates that the State did ask the victim some leading questions, although most of the questions, including most of those relating to Petitioner's involvement in the sexual abuse, were not objectionably leading. Trial Transcript at 36-49.

In fact, defense counsel did object to the very first question that the State asked the victim regarding sexual touching, on the ground that the question was leading, but the objection was overruled. Trial Transcript at 36. But many of the State's follow-up questions were not leading. *E.g.* Trial Transcript at 37 ("Where did he touch you?").

Repeated objections during a jury trial can make a negative impression on the jury, especially if the objections are repeatedly overruled. As the Law Court has observed in the post-conviction review context, trial counsel's failure to object can be ascribed to legitimate trial strategy. *See Raymond v. State*, 467 A.2d 161, 165 (Me. 1983) ("[T]he defense attorney's failure to make certain objections at trial and his advice to the petitioner not to take the witness stand were choices of trial strategy that did not amount to ineffective assistance of counsel").

In light of what the Court in *Strickland* termed the "heavy measure of deference" given to trial counsel's decisions, Petitioner has not established that defense counsel's

18

failure to object to the State's leading questions to the victim rose to the level of constituting ineffective assistance of counsel.

*Ground No. 7: Failure to Object to Reference to A Note Petitioner Allegedly Wrote to Her Daughter, Saying "What Happens in Our Bedroom Stays in The Bedroom"*

Ground No. 7 in the Amended Petition asserts that defense counsel's failure to object to a reference during trial to a note Petitioner wrote saying, "What happens in our bedroom stays in the bedroom" was irreparably damaging. The Amended Petition does not provide a transcript citation to this reference, but the court has located what appears to be the reference. During the direct examination of Steven Crocker, the State asked about Detective Crocker's search of Petitioner's apartment after he had interviewed Petitioner at the victim's school:

Q. What items were you looking for specifically?

A. The vibrators that [the victim] had described and a note that the victim told me her mother had written to her saying what happens in our bedroom stays in our bedroom.

Q. And did you find anything that matched the items the victim had described?

A. No.

Trial Transcript at 71.

The reference to the victim's statement about the content of the note is clearly hearsay (although it could have been deemed a party admission had the victim herself been asked about the note). The witness obviously should not have volunteered any description of the contents of the note.

Be that as it may, the State's question did not refer to the note, and it is not at all clear that defense counsel could have anticipated that the detective's response would include inadmissible and prejudicial hearsay. Her choice, therefore, once the answer had been given, was between moving to strike and asking for a curative instruction or

19

letting the improper answer stand without being highlighted. Because the State did not again refer to the note in questioning, her decision not to call attention to it by registering an objection was within the realm of trial strategy and did not constitute ineffective assistance.

*Ground No. 8: Failure to Object to Admission of "Extraneous Sex Toys"*

The Amended Petition faults defense counsel in Ground No. 8 for failing to object to the admission into evidence of devices beyond the two that the victim and Mr. Cass testified had been used in the course of sexual abuse. The trial transcript indicates that these items belonged to Mr. Cass and were located in two duffel bags in a storage unit near Petitioner's apartment. Trial Transcript at 71. Detective Crocker testified that he seized the two bags and later searched them with Mr. Cass's consent. *Id.* at 71, 74-75.

In fact, defense counsel's decision not to object to the admission of these items into evidence was consistent with the defense theory of the case, which was to blame Mr. Cass for Petitioner's reluctant involvement in his sexual abuse of the victim. The undisputed testimony was that the items belonged to Mr. Cass. His ownership of a large number of sexual devices lent support to Petitioner's claim that he had influenced her into believing that what he was doing to the victim was "normal," and that he was the only principal involved in abusing the victim. Trial Transcript at 228-29. Thus, regarding Ground No. 8, what the Petitioner labels as ineffective assistance of counsel was in fact legitimate trial strategy.

*Ground No. 9: Failure to Cross-Examine the victim*

The ninth ground enumerated in the Amended Petition asserts that defense counsel's failure to cross-examine the victim was "markedly deficient." However, the

20

decision to forego cross-examination of the victim was consistent with the defense strategy that defense counsel and Petitioner had adopted—to endorse the victim's account and to portray Petitioner as, at most, an unwilling accomplice to Mr. Cass's actions.

It is also not clear in what respects cross-examination would have advanced Petitioner's cause. Not only did the victim's testimony implicated Mr. Cass as the primary perpetrator, it also was clear and unequivocal—there is nothing to suggest that cross-examination would have elicited any significant change in her account. In that sense, cross-examination might have done more to reinforce the victim's testimony than detract from it.

Petitioner has not shown that defense counsel's decision not to cross-examine the victim was other than valid trial strategy, and has not shown ineffective assistance of counsel on this ground.

*Ground 10: Failure Adequately to Impeach Mr. Cass Regarding Promises of Leniency*

The Amended Petition asserts as the tenth ground for relief that defense counsel failed to explore impeachment of Donald Cass's testimony with reference to his sentence and the plea discussions surrounding it. After pleading guilty to two counts gross sexual assault, *see* Trial Transcript at 131, Mr. Cass received a sentence of eight years, all but four years suspended.

During Mr. Cass's direct examination, the State elicited from Mr. Cass that he had not made any agreement about testifying against Petitioner before entering his guilty plea. Trial Transcript at 122.

During cross-examination, defense counsel did attempt to elicit the details of Mr. Cass's sentence during her cross-examination of Mr. Cass. Trial Transcript at 159.

21

However, after the State objected, the court sustained the objection, commenting that the jurors would have no basis on which to decide whether the sentence was a lenient one or not. *Id.* at 160. Defense counsel then followed up with questions on whether the plea agreement Mr. Cass reached with the State included any discussion about his testifying against Petitioner. Mr. Cass denied any such discussions. Although attorney Doherty elected to move to a different topic, *see id.*, his denial of any discussion at the time of his plea about his testimony against Petitioner suggests that further questions on the subject would not have been fruitful.

In any case, Petitioner has not shown that defense counsel's decision not to press further was anything other than strategic under the circumstances, and has not shown ineffective assistance regarding this ground.

*Ground No. 11: Failure to Request a Mistrial Based on Issues with Jurors*

The eleventh and last ground set forth in the Amended Petition asserts that defense counsel should have requested a mistrial due to three incidents involving jurors.

The first incident involved a situation in which two jurors saw the Petitioner's daughter crying in the courthouse hallway. *See* Trial Transcript at 57-63. The court responded by questioning the two jurors about whether what they had seen would affect their ability to serve fairly and impartially. *Id.* Both jurors confirmed that they could. *Id.* at 60-62. The court confirmed that neither juror had discussed what he or she had seen with other jurors and asked them not to do so. *Id.* With the parties' consent, the jurors remained on the jury but were moved to alternate positions. *Id.* at 62-63.

The second incident involved a juror who had read an article about the case in the newspaper. Trial Transcript at 167-73. She happened to be one of the same two jurors who were questioned about the first incident, and she had already been made the

third alternate. The juror confirmed that she had seen the headline and a photo of the Petitioner but had then set the newspaper aside and not read the article. *Id.* at 171. She affirmed that she could remain impartial. *Id.* at 172. The court confirmed she had not discussed the article with other jurors and asked her not to do so. *Id.* With the parties' consent, she remained on the jury as the third alternate. Id. at 173-74.

The third incident involved a juror who, during a lunch recess, overhead a conversation involving members of the District Attorney's office discussing an unrelated criminal trial. Trial Transcript at 287-92. During the court's colloquy with counsel about how to address the situation, defense counsel asked for the court to make inquiry of the juror in case the overheard conversation, albeit regarding an unrelated case, might have included content that could affect the juror's ability to serve fairly and impartially—such as how to evaluate witness testimony. *Id.* at 289. The court then questioned the juror, who indicated that the overheard conversation involved an unrelated trial. *Id.* at 290-91. Defense counsel asked the juror whether he had heard "any discussion of the validity of certain types of testimony from certain types of witnesses," and the juror indicated he had not. *Id.* at 292. The court and the parties then agreed that the juror could continue to serve.

After the closing arguments and instruction, the three alternate jurors were excused. Trial Transcript at 331. The alternates included the two jurors who had seen the victim crying, one of whom was also the juror who had seen the newspaper article. *Id.*

Because the court handled all three incidents correctly, by exploring potential prejudice through individual inquiry of each juror and by moving two jurors to alternate status, there was no solid reason to request a mistrial, whether the three

23

incidents are considered separately or cumulatively. The first two incidents were more consequential than the third, and the two jurors involved in the first two did not participate in jury deliberations.

Defense counsel's failure to request a mistrial was not ineffective assistance of counsel.

*Ground No. 12: Failure to Explore the Timing of The Events Underlying the Charges Relative to the Victim's 14th Birthday*

The twelfth and last ground was added on Petitioner's oral motion during the course of the post-conviction hearing. Although she faced three charges of gross sexual assault, Petitioner was convicted only on the GSA count that referenced the victim's 14th birthday, which fell just after the 25-day interval alleged in the indictment. Petitioner contends that defense counsel should have explored in much greater detail the timing of the alleged incidents in relation to the victim's 14th birthday.

During her direct testimony, the victim was clear that the timeframe during which Mr. Cass had sexually abused her extended "from the first weekend in October to, like, Veteran's weekend." Trial Transcript at 39. She said that Mr. Cass and Petitioner had engaged her in sexual activity using vibrators multiple times. *Id.* at 49, 54. She also described an incident on Veteran's Day weekend, after she turned 14, when she and Petitioner and Mr. Cass were all in the shower together and Mr. Cass shaved her genitals. *Id.* at 50.

Mr. Cass's testimony differed markedly from the victim's. He testified to only one incident that he said began in his and Petitioner's bed, where he and Petitioner both applied vibrators to the victim, and continued in the shower, where Petitioner, not Mr. Cass, shaved the victim's genitals. He testified that this single incident had occurred in October before "Labor Day weekend." Trial Transcript at 136. After it was pointed out

24

to him that Labor Day weekend falls during October, Mr. Cass said, "Maybe September, I—I don't remember what the date was then." *Id.*

On cross-examination, defense counsel went over the timeframe in detail in her questions to Mr. Cass, and eventually got Mr. Cass to contradict himself about the timing of the single incident to which he had testified. Trial Transcript at 157-58. He said the single incident had occurred after Halloween and agreed that it therefore must have happened in November. *Id.* at 158. On redirect, the State made an effort to establish the date of the incident in relation to the victim's 14th birthday, but Mr. Cass proved not to have an accurate recollection of the date of the birthday. *Id.* at 162-63.

During closing argument, defense counsel did not refer to the timing of the single incident, despite the fact that Mr. Cass had said during cross-examination that it had happened in November, meaning after the victim's 14th birthday. In hindsight, it can readily be argued that defense counsel should have not only mentioned this point but emphasized it. Petitioner was convicted of gross sexual assault only because the jury decided that the evidence proved that Petitioner committed the offense before the victim had turned 14 years old.

However, defense counsel's performance is not to be evaluated with the full benefit of hindsight. *See Strickland v. United States, supra,* 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"), *quoted in Theriault v. State,* 2015 ME 137, ¶37, 125 A.3d 1163.

Viewed in light of the circumstances, defense counsel's failure to focus during closing argument on the timing of the sexual abuse in relation to the victim's birthday

25

does not "f[a]ll below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Petitioner was facing three GSA charges, not just the one based on the victim being under age 14. The two GSA charges involving compulsion as an element arguably presented the higher risk of a harsh sentence were the Petitioner convicted of either or both. The victim testified that Mr. Cass had compelled her to submit to sexual contact, with the Petitioner participating only when he did, whereas Mr. Cass implicated the Petitioner. The entire premise of the defense theory was to align the Petitioner with the victim's account—in effect, to portray Petitioner as another victim—and to distance the Petitioner from Mr. Cass. Thus, for defense counsel to ask the jury during her closing argument to adopt Mr. Cass's testimony in any respect would have been contrary to the very premise of the defense. It followed, therefore, that the defense closing was largely devoted to attacking Mr. Cass's credibility generally.

Although the State's closing argument did make reference to the dates of the alleged abuse in relation to the victim's birthday, the State did not emphasize the point. Both closings focused more on the Petitioner's involvement—or lack thereof—in the incidents to which the victim and Mr. Cass testified.

Also, the issue of prejudice—or lack thereof—merits discussion. The victim's own testimony was clear that the abuse had begun early in October. She testified to multiple incidents of abuse by Mr. Cass, with her mother present and participating in some instances. Although defense counsel elected not to cross-examine the victim, there is nothing to indicate that cross-examination would have undone or even shaken the victim's recitation of the timing of events.

Thus, to paraphrase the *Strickland* standard, Petitioner has not shown a reasonable probability—meaning a probability sufficient to undermine confidence in the

outcome—that the result would have been different had defense counsel emphasized the timing issue during closing argument or pursued it differently in any other manner. *See Strickland,* 466 U.S. at 695.

*Cumulative Effect of Alleged Grounds for Relief*

Although none of the 12 grounds advanced by Petitioner, considered separately, is sufficient to justify post-conviction relief, their cumulative effect also needs to be considered. However, Petitioner has not shown that defense counsel's performance was substandard—meaning "outside the wide range of professionally competent assistance", *Strickland,* 466 U.S. at 690—in any of the 12 instances that Petitioner relies upon. This makes it unnecessary to consider the issue of prejudice beyond the extent to which it is discussed above.

The court finds and concludes that, whether her grounds for relief are considered separately or collectively, the Petitioner has not met her burden of persuasion.

*Conclusion*

Accordingly, it is ORDERED AND ADJUDGED as follows:

1. The Amended Petition for Post-Conviction Review, as further amended orally, is hereby denied.

2. Judgment shall be entered for the Respondent State of Maine.

Dated April 13, 2017

A. M. Horton
Justice, Unified Criminal Docket

27